## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PREMIER, INC.,
13034 Ballantyne Corporate Place
Charlotte, NC 28277,

                    Plaintiff,

v.

HEALTH RESOURCES AND SERVICES
ADMINISTRATION,
5600 Fishers Lane,
Rockville, MD 20857,

CAROLE JOHNSON,
in her official capacity as Administrator,
Health Resources and Services
Administration,
5600 Fishers Lane,
Rockville, MD 20857,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201,

and

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201,

                    Defendants.

Civ. No. _____

## COMPLAINT

Plaintiff Premier, Inc. (Premier) brings this complaint against the Health Resources and

Services Administration (HRSA), the Department of Health and Human Services (HHS), Carole

Johnson, and Xavier Becerra, and alleges as follows:

## INTRODUCTION

1.      This lawsuit seeks declaratory and injunctive relief from HRSA's policy limiting the circumstances in which hospitals that participate in the 340B Drug Discount Program (340B Program) can use their group purchasing arrangements to purchase non-340B drugs. This policy is plainly contrary to the 340B statute—and thus it may not lawfully be applied to Premier and its members.

2.      Every year, 340B covered-entity healthcare organizations provide collectively billions of dollars in uncompensated, undercompensated, and charitable care to their communities. Many of these organizations "serv[ing] low-income or rural communities" represent the only viable source of quality healthcare for geographically dispersed populations. *Am. Hospital Ass'n v. Becerra*, 142 S. Ct. 1896, 1899 (2022). In the last 25 years, thousands of non-profit, safety-net hospitals have provided nearly $750 billion of uncompensated care to patients in their communities. *Uncompensated Hospital Care Cost Fact Sheet*, Am. Hosp. Ass'n (Feb. 2022), perma.cc/2KJK-WJFL. In 2020, the total value of uncompensated care surpassed $42 billion. *Id.* at 3.

3.      Participation in this safety net comes at a steep financial cost, however. Providing billions of dollars of free or discounted care to Americans each year leads to "substantially lower operating margins" for safety-net hospitals as compared to hospitals with less vulnerable, better-insured patient populations. Allen Dobson et al., *The Role of 340B Hospitals in Serving Medicaid and Low-income Medicare Patients*, 340B Health at 12 (July 10, 2020), perma.cc/UJR4-DR87.

4.      Congress enacted the 340B Program to help these organizations "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (Sept. 22, 1992). The 340B Program thus allows "covered entities" to purchase drugs from manufacturers at a discounted price. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115 (2011).

5. The discounts provided through the 340B Program are limited to drugs dispensed to outpatients. For inpatient drugs, which are not covered by 340B, hospitals typically use group purchasing organizations (GPOs) like Premier to obtain negotiated price discounts. The 340B statute, and HRSA's regulations, provide that a hospital cannot use a GPO discount to buy 340B drugs.

6. However, HRSA has never required covered hospitals to maintain two separate physical inventories of drugs, which would be a significant financial and logistical hardship for the non-profit covered entity hospitals that Congress intended to benefit from the 340B program. Thus, hospitals often maintain one physical inventory of drugs for dispensing to inpatients and outpatients as needed but manage their purchases through virtual inventory systems. Typically, a hospital will dispense a drug to a patient out of its single physical inventory, and then allocate the purchase of the replacement stock for that drug to either a GPO account or a 340B account based on whether the patient was an inpatient or an outpatient. This is called a "replenishment model," which is used throughout the industry and is recognized by HRSA as compliant with the 340B statute.

7. Although Congress intended the 340B Program to help covered entities stretch scarce federal resources, HRSA prohibits certain covered entity hospitals from using either a 340B discount or their negotiated GPO discount when purchasing *initial* inventory for these virtual systems. That is, the hospital can only use its negotiated GPO discount when replacing inventory drugs dispensed to an inpatient—GPO pricing is prohibited when the hospital is first ordering its drug inventory, when a new drug hits the market, when dosages are changed, or when inventory requirements increase. This is a significant additional expense, to the tune of millions of dollars per hospital per year.

8. Thus, HRSA's policy results in unjustified, higher revenue for drug manufacturers—and fewer resources for covered entity hospitals subject to the GPO limitation.

HRSA's policy also limits competition in the drug purchasing market and ultimately results in higher state and federal healthcare costs. And the policy reduces the resources that covered entity hospitals that are subject to the GPO limitation have available to invest in patient care. This ends up reducing the care that safety-net hospitals are able to provide to their communities—and is the exact opposite of Congress's intent.

9.      Because HRSA's policy lacks statutory support and frustrates the clear policy objectives Congress intended to accomplish through the 340B Program, Premier recently requested that HRSA exempt Premier from the policy, or otherwise review and reverse its position. HRSA denied Premier's request for an exemption from its policy.

10.     HRSA's policy is contrary to the text of the 340B statute, frustrates Congress's purposes, is substantively arbitrary and capricious, and was promulgated without statutory authority. HRSA should not be allowed to apply the policy to Premier or any other entity; it should be set aside in full—and, at the very least, it may not be applied to Premier and its members.

## PARTIES

11.     Premier is a leading technology-driven healthcare improvement company, uniting an alliance of thousands of U.S. hospitals, health systems, and other providers to improve healthcare. Premier's integrated data and analytics solutions, collaboratives, supply chain, consulting, and other services improve efficiency and effectiveness of the healthcare supply chain, which enables healthcare providers to deliver better care outcomes at a lower cost. Premier's membership includes more than 4,350 U.S. hospitals and health systems and approximately 300,000 other providers and organizations.

12.     Premier is incorporated in Delaware and maintains its principal place of business in Charlotte, North Carolina.

13.    Defendant Health Resources and Services Administration (HRSA) is an agency within the Department of Health and Human Services (HHS). HRSA is responsible for administering the 340B Program. HRSA is headquartered in North Bethesda, Maryland.

14.    Defendant Carole Johnson is the administrator of HRSA and is the agency official responsible for the 340B Program. She is sued in her official capacity only.

15.    Defendant HHS is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HRSA is an agency of the United States government within HHS. HHS is headquartered in Washington, DC.

16.    Defendant Xavier Becerra is Secretary of Health and Human Services. He is sued in his official capacity only.

## JURISDICTION AND VENUE

17.    Premier brings this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. § 2201.

18.    This case arises under the laws of the United States. The court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

19.    Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendant HHS resides in this district, and no real property is involved in this action.

## FACTUAL ALLEGATIONS

### A.    The 340B program

20.    Congress created the 340B Program in 1992 through the Veteran's Health Care Act, Pub. L. No. 102-585, 106 Stat. 4943 (Nov. 4, 1992), to enable hospitals and healthcare providers that serve low-income and uninsured patients to purchase drugs at lower costs.

21.    In 1990, Congress created the Medicaid Drug Rebate Program. It required pharmaceutical manufacturers to provide rebates for certain medication purchases as a condition of having their drugs covered by Medicaid. Although that law "achieved its objective of generating

savings for the Medicaid program" other federally-funded clinics and public hospitals "experienced substantial price increases in their outpatient drugs as drug manufacturers attempted to limit their rebates to Medicaid." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 315–16 (D.S.C. 2023).

22.     Consequently, Congress enacted the 340B Program to protect specific clinics and hospitals ("covered entities") from price increases and enable them to access drug discounts from manufacturers. Congress intended the 340B Program price reductions to help covered entities "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384 at 12.

23.     The 340B Program is "considered essential to the country's safety net system for medically vulnerable individuals … and it is growing every year." *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 150 (D.N.J. 2021), *aff'd in part, rev'd in part*, 58 F.4th 696 (3d Cir. 2023). HRSA estimates that in 2021, program sales reached approximately $44 billion. Cong. Res. Serv., *Overview of the 340B Drug Discount Program*, IF12232 (Oct. 14, 2022), available at https://crsreports.congress.gov/product/pdf/IF/IF12232.

24.     The 340B Program requires manufacturers of covered outpatient drugs to "offer discounted drugs to covered entities" to be eligible for participation in (*i.e.*, reimbursement from) Medicaid and Medicare Part B. *Astra USA*, 563 U.S. at 115.

25.     "Covered entities" include (among others) black lung clinics, certain children's hospitals and standalone cancer hospitals, critical access hospitals, rural referral centers, federally funded health centers, and certain government-owned and non-profit hospitals that serve a disproportionate share of low-income patients. 42 U.S.C. § 256b(a)(4). Covered entities are "dominantly, local facilities that provide medical care for the poor." *Astra USA*, 563 U.S. at 115; *accord Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 727 (2022) ("Section 340B hospitals … generally serve low-income or rural communities.").

26.     The 340B Program's discounted prices are set through purchase price agreements (PPAs) between the Secretary of HHS and drug manufacturers. 42 U.S.C. § 256b(a)(1). The discount price is set via statutory formula.

27.     The 340B statute borrows the definition of a "covered outpatient drug" from the Medicaid rebate statute. 42 U.S.C. § 256b(b)(1); *see* 42 U.S.C. § 1396r-8(k)(2). That definition in turn depends on the context in which the drug is ultimately provided to the patient—i.e., in an inpatient versus outpatient setting. *See 340B Drug Pricing Program Omnibus Guidance,* 80 Fed. Reg. 52,300, 52,304 (Aug. 28, 2015) (proposed guidance) ("Section 340B of the [Public Health Service Act] does not limit GPO participation for inpatient drug purchases.").

### B.     Premier's group purchasing organization (GPO)

28.     One of the services Premier offers its members is access to its group purchasing organization (GPO) program. Through the GPO program, which is operated by Premier's subsidiary Premier Healthcare Alliance, L.P., Premier leverages its members' aggregate purchasing power to negotiate pricing discounts, improved quality and resiliency of products, and improved contract terms with suppliers. The GPO program covers a wide range of products and services, including medical and surgical products, pharmaceuticals, laboratory supplies, capital equipment, information technology, facilities and construction, food and nutritional products, and other services (such as clinical engineering and workforce solutions). Providers can choose from multiple GPOs and many use multiple GPOs simultaneously. This results in a highly competitive marketplace for procuring healthcare supplies.

29.     In general, GPOs promote competition in the market and reduce costs for healthcare providers, patients, and taxpayers. Hospital executives have indicated that GPOs reduce the cost of healthcare supplies by 10% to 18%. *See* O'Brien et al., *Group Purchasing Organizations: How GPOs Reduce Healthcare Costs and Why Changing Their Funding Mechanism Would Raise Costs: A Legal and Economic Analysis*, perma.cc/6WUW-7PJQ (last visited October 5, 2024).

30.     These negotiated discounts are hugely important to the non-profit, safety-net hospitals that are Premier's members. On average, we estimate that Premier's members could save additional tens or hundreds of millions of dollars a year through GPO purchasing, were it not for HRSA's interpretation of the GPO limitation. As providers of low-cost, accessible health care, many safety-net hospitals operate on razor-thin margins and rely on the savings from the 340B program and negotiated GPO discounts to maintain positive balance sheets. As safety-net hospitals, many are the only provider of accessible care in their regions, and many operate patient assistance programs that use 340B savings to provide patients with free or reduced-cost medication. The more covered entity hospitals are able to save on drug acquisition costs, the more they are able to stretch their resources as a far as possible, reinvest into patient care, and ultimately "reach[] more eligible patients and provid[e] more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12.

### C.     The 340B GPO limitation

31.     The 340B statute contains a provision that prohibits certain covered hospitals from purchasing covered outpatient drugs though the 340B Program and a GPO simultaneously (the GPO limitation). Specifically, for certain hospitals to qualify as "covered entities," the hospital may not obtain "covered outpatient drugs" through a GPO or other group purchasing arrangement. 42 U.S.C. § 256b(a)(4)(L)(iii).

32.     In effect, the GPO limitation provides 340B hospitals a choice of receiving outpatient drug discounts through their GPO or through the 340B Program, but not both. Hospitals may not receive GPO and 340B discounts on the same drug, nor may they "cherry-pick" which outpatient drugs to buy through 340B and which ones to buy through their GPO. *See Univ. Med. Ctr. of S. Nev. v. Shalala*, 5 F. Supp. 2d 4, 8 (D.D.C. 1998). If a hospital chooses to participate in the 340B Program to purchase covered outpatient drugs, it must purchase all its covered outpatient drugs through the program.

33.     However, the GPO limitation does not apply to hospitals' purchasing of other types of drugs—that is, drugs that are dispensed to inpatients or are otherwise not encompassed by the 340B statute's definition of a "covered outpatient drug."

34.     Thus, many hospitals use a 340B account to purchase covered outpatient drugs, and also separately participate in a GPO program or similar group purchasing arrangement for the purchase of inpatient drugs.

35.     Many hospitals (including many of Premier's hospital members) use virtual replenishment inventory systems to organize and maintain a single physical inventory of drugs that are dispensed to both inpatients and outpatients. Drugs purchased for these inventories are known as "neutral inventory." After a neutral inventory is established, the system will collect data about how each drug is dispensed, and then reorder that drug based on whether it was dispensed to a 340B-eligible patient, or if not, was a qualifying GPO dispense. This is called a "replenishment" system.

36.     The replenishment system proceeds in three steps. First, the covered entity hospital dispenses a certain drug in a certain amount to a patient. The hospital then determines whether the particular dispense qualifies for 340B (using various software systems, which are audited by HRSA). If it does, the hospital "accumulates" a future purchase of the drug on its 340B account.

37.     For example, if a 340B-eligible outpatient receives a drug from the neutral inventory, it will be "accumulated" for a future purchase on the hospital's 340B account to replace the dispensed drug. If an inpatient receives a drug from the neutral inventory, it will be accumulated for a future purchase on the hospital's GPO account to replace the dispensed drug.

38.     After sufficient quantities of a particular drug are dispensed and accumulated to a particular account to allow for ordering a full package size of the drug, the hospital will purchase the accumulated replacement drugs through that account. When a new package of the particular drug arrives, it becomes "neutral inventory" that may be dispensed to any subsequent patient, with

appropriate tracing to "accumulate" the next round of replenishments through either the 340B account or the GPO account. Importantly, the system works because the quantity of drugs obtained at 340B discounts always matches the quantity of drugs dispensed to 340B-eligible patients.

39.    Since the beginning of the 340B Program, HRSA has never required hospitals to keep separate *physical* inventories of 340B drugs. *See Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines*, 59 Fed. Reg. 25,110, 25,111 (May 13, 1994) ("There is no requirement for separate inventories"). HRSA's FAQ page states: "The 340B statute and guidelines do not require separate physical inventories for 340B drugs. The statute and guidelines do require covered entities to have fully auditable purchasing and dispensing records that document compliance with all 340B requirements including the prohibition on drug diversion and duplicate discounts." HRSA, 340B FAQ, perma.cc/CY2M-JPBS (last visited Oct. 28, 2024) (FAQ ID: 1343).

40.    Thus, the virtual replenishment model is used throughout the industry to allow hospitals to maintain compliance with the 340B Program's requirements without the additional cost and logistical expense of maintaining two separate physical inventories for 340B and non-340B drugs.

41.    HRSA has acknowledged that the virtual replenishment model is compliant with the 340B statute. In June 2021, the Director of HRSA's Office of Pharmacy Affairs, Rear Admiral Krista M. Pedley, explained in a signed declaration—on behalf of HRSA—how the replenishment model works in the contract pharmacy context.[1] *See also* 59 Fed. Reg. at 25,113 ("The covered

---

[1]    The declaration was submitted in *Eli Lilly & Co. v. Becerra,* Case No. 1:21-cv-00081-SEB-MJD, ECF No. 125-2 (June 25, 2021); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, Case No. 3:21-cv-00634-FLW-LHG, ECF No, 89-2 (June 16, 2021); *Novo Nordisk Inc. v. U.S. Dep't of Health & Hum. Servs.*, Case No. 3:21-cv-00806-FLW-LHG, ECF No. 53-2 (June 22, 2021); and *United Therapeutics Corp. v. Espinosa*, Case No. 1:21-cv-01686-DLF, ECF No. 17-1 (Aug. 10, 2021).

entity may, at its option, develop an alternative system, short of tracking each discounted drug through the purchasing and dispensing process, by which it can prove compliance.").

42.     RADM Pedley noted that covered entities must maintain systems to demonstrate that the covered entity is properly accounting for 340B drug purchases in the replenishment orders, which HRSA can then audit to confirm compliance. RADM Pedley expressly recognized that the replenished "neutral inventory" "may be dispensed to any subsequent patient." Declaration of RADM Krista M. Pedley ¶ 11, attached hereto as Exhibit 1.

**D.    Premier applies to HRSA for an exemption from the GPO limitation**

43.     In 2013, HRSA adopted a policy clarifying the scope of the GPO limitation as it applies in the context of a virtual replenishment system. HRSA, *Statutory Prohibition on Group Purchasing Organization Participation*, Release No. 2013-1 (Feb. 7, 2013) (the "2013 Policy"), attached hereto as Exhibit 2.

44.     HRSA stated that "a 340B covered entity subject to the GPO prohibition" must purchase covered outpatient drugs "using a non-GPO account and only replenish with 340B drugs once 340B patient eligibility is confirmed and can be documented through auditable records." *Id.* at 3.

45.     The implication of this policy is that a covered entity hospital subject to the GPO limitation must purchase initial drug stock for the pharmacy inventory using a wholesale account. That is, the hospital must use an account that purchases drugs at the wholesale acquisition cost (WAC), rather than either the lower 340B price or a lower GPO-negotiated price—and is only able to replenish the inventory with 340B drugs once 340B patient eligibility is confirmed (that is, once a drug is dispensed to an outpatient).

46.     Making this change required covered entity hospitals subject to the GPO limitation to significantly re-tool their software systems. Unlike before, when billing systems were only required to track 340B-eligible dispenses and accumulations, now hospitals are required to keep

track of three separate accumulators—one for the 340B account, one for the GPO account, and one for the WAC account. Hospitals use split billing software to manage these accumulations, keep track of 340B-eligible purchases, and generally demonstrate 340B compliance.

47.     Because under the 2013 Policy a covered entity hospital is not allowed to use either a GPO account or a 340B account to purchase the initial stock for a neutral inventory, HRSA's position dramatically increases drug purchasing costs for hospitals, resulting in higher revenue for drug manufacturers and the 340B prime vendor, and less savings for covered entities.[2]

48.     On July 27, 2023, Premier wrote to HRSA to request an exemption from the 2013 Policy or that HRSA review and revise that policy. Letter from David Klatsky, General Counsel, Premier, Inc., to LCDR Emeka Egwim, United States Public Health Service Director, Office of Pharmacy Affairs, HRSA (July 27, 2023), attached hereto as Exhibit 3. Premier informed HRSA that it wished to offer to its 340B hospital covered entity members the option to make initial purchases of drugs through their GPO accounts and requested HRSA's approval to do so.

49.     Premier argued that HRSA's construction of 42 U.S.C. § 256b(a)(4)(L)(iii) as prohibiting a hospital from purchasing its initial inventory through a GPO account was incorrect.

50.     The statutory definition of a "covered outpatient drug" depends on the context in which the drug is ultimately provided to a patient. *Id.* § 1396r-8(k)(2), (k)(3)(A). Thus, according to the statute, a drug cannot be a "covered outpatient drug" until the circumstances in which the drug will be provided to a patient is known. When the drug is provided to an outpatient such that the drug becomes a "covered outpatient drug," the future replenishment of that drug is reflected in the 340B accumulator for that drug in the hospital's virtual replenishment system. This

---

[2]     The 340B prime vendor program is a contract awarded by HRSA to a vendor that is responsible for supporting the 340B program by negotiating discounts, providing resources, and offering technical assistance. *See* 42 U.S.C. § 256b(a)(8); HRSA, *What is the 340B Prime Vendor Program (PVP)?* (last updated June 2024), perma.cc/3HJ8-8N4X. The current prime vendor is Apexus.

"replenishment" purchase of the dispensed drug is the purchase that is subject to the GPO limitation. Indeed, the only way to understand the statute in a way that allows virtual inventory systems (which HRSA does) is that the replenishment purchase is the relevant 340B purchase under the statute.

51.     By extension, the purchase of initial inventory is not a 340B purchase and thus is not subject to the GPO limitation.

52.     This interpretation is consistent with the statutory language in Section 256b. Specifically, the statutory prohibition on 340B drug diversion prohibits covered entities from "resell[ing] or otherwise transfer[ring] the [covered outpatient drug] to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). This resale provision makes clear that a 340B-purchased drug is classified at the time of purchase, because the provision regulates only covered entities' handling of drugs already purchased at the 340B price. Unlike the GPO limitation, the resale provision does not regulate the purchase of the drug—it regulates what a covered entity may do with a drug it has already purchased on a 340B account.

53.     By contrast, the GPO limitation specifies that certain covered entities may "not *obtain* covered outpatient drugs through a group purchasing organization or other group purchasing arrangement." 42 U.S.C. § 256b(a)(4)(L)(iii) (emphasis added). Thus, the GPO limitation is a restriction on which accounts can be used to purchase covered outpatient drugs, while the diversion prohibition is a restriction on transferring or selling covered outpatient drugs that have already been purchased through a 340B account.

54.     Thus, in a virtual replenishment model, the GPO limitation applies only to the second "replenishment" purchase, because the second purchase is the only purchase that can be made through a 340B account, where it is unknown if a drug qualifies for 340B purchase until it is dispensed). The resale provision applies to drugs purchased on a 340B account upon the first

initial purchase, because the initial purchase must have been at the 340B price for the resale prohibition to apply.

55.     This interpretation also harmonizes that language with the legislative intent behind the 340B Program and the Medicare prudent buyer principle.

56.     As noted, the 340B Program was intended to help covered entities "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384 at 12. HRSA's 2013 Policy, however, does the opposite. It forces covered entities to purchase drugs at a higher cost than they otherwise would be able to, shifting "scarce … resources" from covered entities to drug manufacturers. This, in turn, reduces the resources that non-profit, covered entity hospitals have available to invest in patient care, which is the opposite of Congress's stated goal for the 340B program.

57.     Similarly, the 2013 Policy prevents covered entities from complying with the government's "prudent buyer" principle for healthcare providers. As set forth in the Medicare Provider Reimbursement Manual, the government expects providers to be "prudent and cost-conscious" buyers of items and services, including by obtaining discounts for bulk purchases. CMS, Provider Reimbursement Manual – Part 1, CH. 21, Sec. 2103. HRSA's policy is inconsistent with this principle. The 2013 Policy requires covered entities to purchase drugs at a higher price than they could otherwise obtain through a GPO program.

58.     Despite Premier's presentation of these arguments to HRSA, HRSA denied Premier's request for an exemption on December 20, 2023. Letter from Chantelle V. Britton, Acting Director, Office of Pharmacy Affairs, HRSA, to David Klatsky, General Counsel, Premier Inc. (Dec. 20, 2023), attached hereto as Exhibit 4. Premier wants to offer its covered entity members access to its GPO purchasing model for their initial drug inventory purchases, but as a result of this denial, it is unable to do so. As a result, Premier is unable to process GPO transactions

that it otherwise would be able to, which results in millions of dollars of lost revenue for Premier annually.

59.    HRSA has made clear that there are steep penalties for violating the GPO limitation. HRSA's 2013 Policy states that "covered entities found in violation [of the GPO limitation] will be considered ineligible and immediately removed from the 340B Program." 2013 Policy at 3. "Covered entities may also be subject to repayment to manufacturers for the time period for which the violation occurred." *Id.*; *see also* Public Health Service, *Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992, Entity Guidelines*, 59 Fed. Reg. 25,110, 25,113 (May 13, 1994) ("If [certain participating hospitals] participate[] in a GPO or other group purchasing arrangement for covered outpatient drugs, the [hospital] will no longer be an eligible covered entity and cannot purchase covered outpatient drugs at the section 340B discount prices.").

**E.    HRSA's action is unlawful under the APA**

      *1.    HRSA's action is contrary to the text of the 340B Statute.*

60.    Under the APA, courts have a duty to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120-21 (D.C. Cir. 2014). Simply put, "[a]n agency order that is at odds with the requirements of the applicable statute cannot survive judicial review." *UPS v. Postal Reg. Comm'n*, 955 F.3d 1038 (D.C. Cir. 2020).

61.    At its core, the 2013 Policy asserts that the statutory GPO limitation contained in 42 U.S.C. § 256b prohibits hospitals participating in the 340B Program from using drug replenishment systems in which initial neutral inventories are purchased through a GPO account. This interpretation is inconsistent with the text of the statute.

62.    The definition of a "covered outpatient drug" for 340B purposes depends on the circumstances in which the drug is "provided" to the patient, i.e., the definition of a covered

outpatient drug depends on the circumstances in which it is dispensed. 42 U.S.C. § 256b(b)(2)(A); 42 U.S.C. § 1396r-8(k)(2).

63.    HHS has recognized this understanding of the text of the statute. *See* 59 Fed. Reg. at 25,113 (a covered entity "may not use the covered outpatient drug in excluded services (e.g., inpatient services)"); *see also* 80 Fed. Reg. at 52,305 (proposed guidance) ("A GPO may only be used by one of the affected covered entities to purchase drugs *dispensed to inpatients* or to purchase drugs which do not meet the definition of covered outpatient drug.") (emphasis added).[3]

64.    In a virtual inventory system, a hospital obtains a drug to stock its initial neutral inventory without knowing if that drug will be provided to an inpatient or an outpatient. Thus, the drugs purchased to stock the initial inventory by definition cannot be "covered outpatient drugs" at that point.

65.    When a drug from the neutral inventory is provided to an outpatient such that it becomes a covered outpatient drug, the replenishment of that drug is accumulated for a future 340B purchase on the hospital's 340B account. This "replenishment" purchase of the dispensed drug through the hospital's 340B account is subject to the GPO limitation. By contrast, the initial purchase of neutral inventory is not subject to the GPO limitation.

---

[3]    HHS has also recognized that Congress's choice to incorporate the Medicaid definition of a covered outpatient drug into the 340B statute results in some complexities, and thus aspects of Section 1396r-8(k) only serve to limit the definition of a covered outpatient drug in the 340B context when payment for the drug is bundled for payment with the service provided. *See* 59 Fed. Reg. at 25,113 (noting that, in the context of certain inpatient and outpatient settings, "if a covered drug is included in the per diem rate (i.e., bundled with other payments in an all-inclusive, per visit, or an encounter rate), it will not be included in the section 340B discount program. However, if a covered drug is billed and paid for instead as a separate line item as an outpatient drug in a cost basis billing system, this drug will be included in the program."). This interpretation further underscores the fact that whether a "covered outpatient drug" falls within the 340B program depends on the circumstances in which it is ultimately dispensed to the patient. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

66.     Indeed, HRSA's own position, reflected in RADM Pedley's declaration, is that 340B drug purchases in a virtual inventory system occur upon replenishment, and that the initial purchase of neutral inventory is not a 340B drug purchase. It follows that the GPO limitation cannot apply to the initial purchase of neutral inventory under HRSA's own reasoning, because initial drugs purchased for a neutral inventory are not "covered outpatient drugs" at the time of purchase.

67.     Supreme Court precedent further confirms that a replenishment model is consistent with the 340B statute. In *Abbott Laboratories v. Portland Retail Druggists*, the Supreme Court analyzed a federal antitrust law prohibiting preferential pricing among customers that share a common profile—a restriction analogous to the GPO limitation in the 340B Program. 425 U.S. 1, 6 (1976). The Court concluded that the antitrust law applied to some drugs but not others, depending on the circumstances in which a drug was dispensed by the hospital. *Id.* at 10-11, 14. When the hospital dispensed a drug for its own use (e.g., dispensed drugs to inpatients), that drug was exempt from the antitrust law. However, when the hospital dispensed a drug in other scenarios (such as to a walk-in customer), the drugs were not for the hospitals' own use and were not exempt from the law. *See generally id.* at 8-18.

68.     The Court reasoned that hospitals could create a "recordkeeping procedure" that categorized drugs by nonexempt use and exempt use. The hospital would then submit an accounting and price adjustment to the drug manufacturer after the drug was dispensed. *Id.* at 20. This "recordkeeping procedure" is, in modern parlance, equivalent to a "virtual inventory." Consistent with *Abbott*, a GPO-based replenishment model is permissible and in fact necessary to facilitate a purchasing standard based on eventual dispense of a drug.

69.     Furthermore, Congress did not intend to proscribe a particular method of accounting or purchasing system when it enacted the 340B Program. Nothing in the statute or legislative history indicates that Congress intended to force covered entity hospitals to maintain

separate physical inventories for 340B drugs or proscribe a particular method of implementing 340B discounts. HRSA's own position approving of virtual inventory systems aligns with Congress's intent. *See* HHS, *Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines*, 59 Fed. Reg. 25,110, 25,111 (May 13, 1994) ("There is no requirement for separate inventories.").

70.    Thus, Supreme Court precedent and HRSA's own position confirm that a virtual replenishment model is consistent with the 340B statute. And, in order for a replenishment model to be consistent with the statute, it must be the case that 340B drug purchases occur when the neutral inventory is replenished. It follows that the GPO limitation cannot apply to the initial purchase of neutral inventory, because drugs purchased through a GPO for a neutral inventory are not "covered outpatient drugs" at the time of purchase.

71.    Thus, HRSA's interpretation of 42 U.S.C. § 256b(a)(4)(L)(iii), as embodied in the 2013 Policy, is contrary to the text of the statute.[4]

72.    For the same reasons, HRSA's denial of Premier's request for an exemption from the 2013 Policy is contrary to law. Because HRSA has no authority to prevent covered entity hospitals from purchasing their initial inventories through GPO programs, HRSA had no statutory authority to deny Premier's request for an exemption from that policy. *Atl. City Elec. Co. v. FERC*,

---

[4]    Nor is HRSA entitled to any deference for its interpretation. For one, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), overruled the longstanding *Chevron* framework, under which courts were obligated to defer to federal agencies' reasonable interpretations of ambiguities in statutes they administer. Moreover, even prior to *Loper Bright*, HRSA would not have been entitled to *Chevron* deference in this instance because it lacks delegated authority from Congress to make rules governing the 340B Program. *United States v. Mead Corp.*, 533 U.S. 218, 226-27, (2001). The Court may still consider some aspects of agency reasoning when construing statutes but only so far as the agency's position has the "power to persuade" the Court. *Skidmore v. Swift & Co.*, 323 U. S. 134, 140 (1944). HRSA must therefore defend its interpretation as the "best" or most persuasive reading of the statute. *Loper Bright*, 144 S. Ct. at 2266.

295 F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand.").

>            2.    *HRSA's action is arbitrary and capricious.*

73.    A reviewing court must "hold unlawful and set aside" any aspect of an agency action that is "arbitrary, capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

74.    Agency action is arbitrary and capricious under § 706(2)(A) "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). An agency decision, even if not manifestly contrary to the statute, is still unreasonable if it is "arbitrary or capricious in substance." *Amaya v. Rosen*, 986 F.3d 424, 432 (4th Cir. 2021), *as amended* (Apr. 12, 2021) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

75.    Further, agency action must be a product of "reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 69 (D.C. Cir. 2012). Courts will "strike down agency action if the agency failed to consider relevant factors or made a clear error of judgment. *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1195 (D.C. Cir. 2000). If an agency action "frustrate[s] the policy that Congress sought to implement," it is arbitrary and capricious. *Illinois Commerce Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984) (quoting *Fed. Elec. Comm'n v. Democratic Senatorial Comm'n*, 454 U.S. 27, 39 (1981)); *accord St. Francis Hosp. v. Bowen*, 802 F.2d 697, 699 (4th Cir. 1986).

76.    HRSA's decision to publish the 2013 Policy and refuse to withdraw or waive it as applied to Premier and its members is arbitrary and capricious in two ways.

77.    *First*, the 2013 Policy frustrates the objectives Congress sought to achieve with the 340B Program.

78.    Congress intended the 340B Program to prevent manufacturers' rising prescription drug prices from "reduc[ing] the level of services and the number of individuals that [] hospitals and clinics are able to provide with the same level of resources." H.R. Rep. 102-384, pt. 2, at 11. By providing participating hospitals with protection from drug manufacturers' price increases, the 340B Program would enable hospitals to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *Id*. at 12.

79.    Because the 2013 Policy prevents covered entity hospitals from purchasing their initial neutral inventory through a GPO, those hospitals face dramatically higher drug purchasing costs than they otherwise would. We estimate that the 2013 Policy costs Premier's covered entity hospital members tens or hundreds of millions of dollars in terms of lost savings annually. The 2013 Policy thus results in more revenue for drug manufacturers and the 340B prime vendor and less savings for covered entity hospitals—the exact outcome Congress sought to avoid when it enacted the 340B Program.

80.    Furthermore, HRSA's policy results in covered safety net hospitals potentially paying *more* for their initial neutral inventories than non-covered hospitals that do not serve disproportionally low-income patients. This, too, is not what Congress intended.

81.    HRSA's policy is also inconsistent with the government's prudent buyer principle.

82.    For over 50 years, the federal government has maintained a "prudent buyer" principle for healthcare providers, pursuant to which the government expects providers to be "prudent and cost-conscious purchasers" of services. *See, e.g.*, U.S. Bureau of Health Insurance, Intermediary Letter No. 393, *Identifying unreasonable costs—application of the prudent buyer concept* (Aug. 1969).

83.    The principle is set forth in its current form in the Medicare Provider Reimbursement Manual:

> A.  <u>General</u>. The prudent and cost-conscious buyer not only refuses to pay more than the going price for an item or service, he/she also seeks to economize by minimizing cost. **This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases**. …. Any alert and cost-conscious buyer seeks such advantages, and it is expected that Medicare providers of services will also seek them.

CMS, Provider Reimbursement Manual – Part 1, CH. 21, Sec. 2103 (emphasis added).

84.    HRSA's policy is directly opposed to this principle. The 2013 Policy requires covered entities to purchase drugs at a higher price than they could otherwise obtain through a GPO program. *Requiring* hospitals to *forgo* an available discount when purchasing drugs is plainly *im*prudent, contradicting the government's longstanding expectation that hospitals behave as "prudent and cost-conscious" consumers. This, too, diverts available resources away from patient care.

85.    Requiring hospitals to purchase their initial inventory on the prime vendor's wholesale account also suppresses competition and increases drug costs. Hospitals tend to buy the same drugs for their inpatients and outpatients, so forcing them to buy their initial neutral inventory through a wholesale account dominated by a single 340B prime vendor locks hospitals into using the 340B prime vendor's preferred drugs and preferred prices within the inpatient market. This raises costs for covered hospitals and (by extension) state and federal healthcare programs. It is a clear departure from what Congress intended.

86.    Further, HRSA has not identified any competing congressional or statutory purpose served by its interpretation. As explained further below, *infra* ¶¶ 88-96, HRSA's 2013 Policy Release contains virtually no analysis of whether HRSA's interpretation is consistent with the goals of the 340B Program or the government's longstanding prudent-buyer principle.

87.     Thus, HRSA's 2013 Policy is not the result of "reasoned decisionmaking." HRSA "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43—namely that its interpretation of the GPO limitation prevents covered hospitals from establishing neutral inventories using discounted pricing that would otherwise be available to them and thereby suppresses competition in the drug purchasing market. HRSA has also "frustrate[d] the policy that Congress sought to implement." *Illinois Commerce Comm'n*, 749 F.2d at 880. Congress enacted the 340B Program to help covered hospitals conserve resources, not to shift funds *from* covered entities *to* drug manufacturers and the 340B prime vendor. Thus, HRSA's 2013 Policy is arbitrary and capricious.

88.     *Second*, HRSA's 2013 Policy is an unreasoned and unexplained departure from HRSA's prior interpretation of the statute.

89.     When an agency "fail[s] to provide any coherent explanation for its decision … the agency's action [is] arbitrary and capricious for want of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 69 (D.C. Cir. 2012). In other words, "[a]n agency decision is arbitrary and capricious if it is not reasonably explained." *Antilles Consolidated Educ. Ass'n v. Fed. Labor Relations Auth.*, 977 F.3d 10, 15 (D.C. Cir. 2020).

90.     "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "In such cases, it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio*." *Id*. at 515.

91.     When the 340B Program was first enacted, HRSA interpreted the GPO limitation as only preventing covered entities from "double-dipping," i.e., receiving 340B discounts on the same drugs the hospital purchased through a GPO. *See Med. Ctr. of So. Nev. v. Shalala*, 173 F.3d 438, 439 (D.C. Cir. 1999). Then, in 1994, HRSA issued a final rule that largely tracked the statutory language without elaboration. 59 Fed. Reg. at 25,113. From 1994 to 2013, hospitals used GPO-based replenishment systems under which initial neutral inventory was purchased on a GPO account without any indication from HRSA that such a system ran afoul of the statute.

92.     Indeed, until 2012, HRSA's 340B prime vendor Apexus indicated in an FAQ that hospitals that use replenishment systems where initial purchases are from GPOs are "compliant" if the replenishment occurs "at the exact 11-digit NDC level for all drugs dispensed to eligible patients."

93.     In 2013, HRSA published the 2013 Policy Release (Release No. 2013-1), purporting to "clarify the 340B Drug Pricing Program's (340B Program) policy regarding the statutory prohibition against obtaining covered outpatient drugs through a group purchasing organization (GPO) for certain covered entities." *Id.* at 1. This Policy Release abruptly reversed HRSA's prior position and stated that "GPO replenishment model[s]" are not authorized by HRSA and hospitals should "immediately cease this practice." *Id.*

94.     HRSA dedicated a scant two paragraphs in the 2013 Policy Release to its analysis of the GPO prohibition in the context of a replenishment model. *Id.* at 2. HRSA made no mention of the statutory language or the definition of a "covered outpatient drug." *Id.* at 2-3. It wholly failed to consider the practical implications of its policy choice and whether that choice was consistent with the purpose of the 340B Program and Congress's intent. And, HRSA did not acknowledge, let alone explain, its change in position. That renders HRSA's action arbitrary and capricious, as "an agency changing its course … [must] supply a reasoned analysis." *State Farm*, 463 U.S. at 42.

95.     HRSA's denial of Premier's request for an exemption from the 2013 Policy suffers from the same fatal flaws. As an application of the 2013 Policy, it is inconsistent with the goals of the 340B Program and forces Premier's hospital members to behave contrary to the government's prudent buyer principle to the detriment of the patients they care for. It lacks reasoned analysis and meaningful consideration of these factors.

96.     Thus, HRSA's denial of Premier's request was arbitrary and capricious and must be set aside.

### 3.     *HRSA lacked statutory authority to issue the 2013 Policy release.*

97.     The 2013 Policy is also invalid because it imposes binding legal requirements on regulated parties, even though HRSA lacks the power to issue substantive, legislative rules regarding the GPO limitation.

98.     "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*" *Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 36 (D.D.C. 2014) ("*PhRMA I*") (quoting *City of Arlington, Tex. v. FCC*, 596 U.S. 290, 297 (2013) (emphasis in original)).

99.     HRSA's power to enact legislative rules "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

100.    In *PhRMA I*, the district court analyzed HRSA's rulemaking authority under the 340B statute to assess the validity of HRSA's 340B regulation of orphan drugs. 43 F. Supp. 3d at 41. The court concluded that HRSA may only regulate in three areas: 1) ADR proceedings; 2) ceiling prices; and 3) civil monetary penalties. *Id.* The court concluded that these three grants of regulatory authority did not vest HRSA with authority to issue a substantive rule regulating orphan drugs. *Id.*

101.    The same reasoning applies here. The GPO limitation is not addressed in any of the three areas of rulemaking authority granted to HRSA by Congress. Consequently, HRSA lacks the authority to issue legislative rules regarding the GPO limitation.

102.    Legislative rules "effect[] a substantive regulatory change to the statutory or regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). (quoting *Elec. Privacy Info. Ctr.*, 653 F.3d at 6-7). Under that definition, "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing policy." *Id.*; *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018).

103.    The 2013 Policy announces that "HRSA has not authorized" a GPO-based replenishment model and "[h]ospitals using such models should immediately cease this practice or be found in violation of the GPO prohibition." 2013 Policy at 2-3. The 2013 Policy directs covered entities "subject to the GPO prohibition … [to] purchase using a non-GPO account and only replenish with 340B drugs once 340B patient eligibility is confirmed and can be documented through auditable records." *Id.* at 3. The 2013 Policy further states that "covered entities found in violation will be considered ineligible and immediately removed from the 340B Program." *Id.*

104.    This is a quintessential legislative rule. It affects a change in HRSA's understanding of the GPO limitation and imposed new requirements on covered entities—namely, that they immediately cease purchasing initial neutral inventories through GPO-based accounts. In so doing, the 2013 Policy "supplements [the] statute" and "effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021.

105.    Thus, the 2013 Policy does exactly what HRSA lacks the authority to do: it imposes new legally binding requirements on private parties. *Id.*; *see also Kisor v. Wilkie*, 588 U.S. 558, 583-584 (2019) (legislative rules "have the force and effect of law" and "impose 'legally binding

requirements' on private parties" (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014)).

106.    Because HRSA's 2013 Policy "impose[s] legally binding obligations [and] prohibitions on regulated parties" and "sets forth legally binding requirements" for regulated entities, the policy is a legislative rule beyond HRSA's authority to promulgate. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *see also Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 621 (4th Cir. 2018) (holding HHS FAQ document was a legislative rule because the policy it announced did not derive from the statute and the Secretary relied on the FAQ to calculate the maximum financial assistance available to hospitals under Medicaid).

107.    "In the absence of statutory authorization for its act, an agency's 'action is plainly contrary to law and cannot stand.'" *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)). HRSA's 2013 Policy is therefore invalid as promulgated in "excess" of HRSA's statutory authority and must be set aside. 5 U.S.C. § 706(2)(C).

108.    HRSA cannot justify its action as an "interpretative rule" under the APA because the 2013 Policy does not interpret any part of the 340B statute. 5 U.S.C. § 553.

109.    "Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track' preexisting requirements and explain something the statute or regulation already required." *Mendoza*, 754 F.3d at 1021. "To be interpretative, a rule must derive a proposition from an existing document whose meaning *compels or logically justifies* the proposition." *Id.* (emphasis added). "In that sense, an interpretive rule explains pre-existing legal obligations or rights rather than creating legal effects." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).

26

110.    In its discussion of the replenishment model, the 2013 Policy does not mention, let alone interpret, any statutory provision of Section 340. *See* 2013 Policy at 2-3. HRSA simply declares that covered entities subject to the GPO limitation should purchase initial inventories using a "non-GPO account" in the first instance. *Id.* at 3. As explained above, this limitation is inconsistent with the statute's text. At the very least, nothing in section 340B "compels or logically justifies" HRSA's conclusion. Thus, the 2013 Policy is not an interpretative rule under the APA.

F.    **HRSA's action is reviewable under the Administrative Procedure Act**

111.    The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704.

112.    Two conditions must be satisfied for agency action to be "final." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process" and must not be "of a merely tentative or interlocutory nature." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (quoting *Bennett*, 520 U.S. at 177-178)). "And second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Id*.

113.    HRSA's decision to deny Premier's request for an exemption from—or to reconsider—its 2013 Policy satisfies both conditions.

114.    *First*, HRSA's decision marks the "consummation" of the agency's decisionmaking process. *Appalachian Power Co.*, 208 F.3d at 1022. It reads: "HRSA does not plan to exempt Premier's proposed arrangement or reverse its 2013 Policy Release." Exhibit 4 at 1. There is no further recourse available to Premier within the agency to obtain review of HRSA's decision. S*ee City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007) (finding an agency letter to constitute final agency action where "[n]othing in the letter indicate[d] that the [agency's] statements and conclusions [were] tentative, open to further consideration, or conditional on future agency action.").

115.    HRSA's decision also carries legal consequences. Premier wants to offer its covered entity hospital members the ability to make initial purchases of drugs through their GPO accounts. HRSA's letter prevents Premier from doing so. Premier and its members would risk adverse legal consequences—including possible immediate removal from the 340B Program—if they were to defy HRSA's order.

116.    Letters setting forth the agency's interpretation of a statute can constitute final agency action, particularly when the letter applies an existing policy to an individual party's actions. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 (D.C. Cir. 1986) (noting additional factors to consider as a complement to the *Bennett* analysis when considering a pre-enforcement agency action, including: (1) whether the agency has "taken a 'definitive' legal position concerning its statutory authority"; (2) whether "the case presented 'a purely legal' question of 'statutory interpretation'"; and (3) whether "the agency's letter imposed an immediate and significant practical burden on [Plaintiff]").

117.    For example, in *SecurityPoint Holdings, Inc. v. Transportation Sec. Admin.*, 769 F.3d 1184, 1187 (D.C. Cir. 2014), SecurityPoint wrote to TSA objecting to certain modifications TSA had made to its template memorandum of understanding (MOU) with airports. SecurityPoint requested that TSA "cease and desist from requiring airports to agree to the new MOU language." *Id.* at 1187. TSA denied the request via letter. *Id.* The D.C. Circuit determined that the letter was the "consummation of TSA's decisionmaking process regarding SecurityPoint's contention that it should abandon the challenged alterations of the MOU language…. [and] [gave] rise to legal consequences by confirming that participating airports will be subject to TSA's new mandatory MOU language." *Id.* It was therefore a reviewable final agency action. *Id.*; *see also CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (holding a DOT letter final because it instructed Plaintiff to "cease and desist" from further conduct and gave a 180-day grace period to comply); *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106,

112, 113-115 (D.D.C. 2014) (Customs and Border Patrol informing plaintiffs that their cruise operations were in violation of immigration law via letter was a "final agency action").

118.    Indeed, in recent manufacturer suits challenging HRSA's 340B contract pharmacy policy, HRSA acknowledged that similar letters it sent to manufactures ordering them to comply with HRSA's policy were final agency actions. *See* Order at *35, *Eli Lilly & Co. v. U.S. Dep't of Health & Human Servs.*, No. 1:21-cv-00081-SEB-MJD (S.D. Ind. Oct. 29, 2021) ("Plaintiffs contend, and both sides agree, that the May 17 Letter constitutes a final agency action.").

119.    Put simply, once an agency, like HRSA here, "publicly articulates an unequivocal position … and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba-Geigy*, 801 F.2d at 436.

120.    HRSA's letter denying Premier's request is unequivocally final agency action subject to review under the APA.

**G.    Premier's lawsuit is timely**

121.    In general, a suit against the federal government, including one under the APA, is barred unless "filed within six years after the right of action first accrues." 42 U.S.C. § 2401(a); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024) (holding that the statute of limitations in § 2401(a) runs from when the plaintiff "suffers an injury from final agency action," not the date the rule was published).

122.    However, there is a "long-recognized exception" to this six-year limitations period. When an agency "'seeks to apply [a] rule' after the statute of limitations has passed," those affected by the application "'may challenge that application on the grounds that it conflicts with the statute from which its authority derives.'" *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 971 F.3d 340, 348 (D.C. Cir. 2020) ("*CREW*") (quoting *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014)). Thus, "a party against whom a rule is applied

may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule." *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 37 (D.D.C. 2019).

123.    Although this exception often arises in the context of an enforcement action, the exception to the limitations period for as-applied challenges is "not limited to agency enforcement actions." *CREW*, 971 F.3d at 348. The D.C. Circuit has, for example, "considered the validity of rules that an agency applied in an order imposing certain limitations on a broadcast licensee, … in an order rejecting challenges to auction procedures to which a bidder objected, …, in an order dismissing a complaint based on the FCC's tariff-filing requirements, …, and in an order denying a mineral lessee's claim to certain royalty reimbursements." *Weaver*, 744 F.3d at 145–46.

124.    As discussed above, courts have routinely held that an agency letter applying an existing rule or policy to a particular regulated party is final agency action for which review is available. When such an application occurs outside the six-year statute of limitations, the affected party "may challenge that application on the grounds that it conflicts with the statute from which its authority derives." *Weaver*, 744 F.3d at 145.

125.    HRSA directly applied the 2013 Policy to Premier when it denied Premier an exemption from that policy on December 20, 2023.

126.    Premier's lawsuit is therefore timely filed.

**CLAIMS FOR RELIEF**

**COUNT I**
**AGENCY ACTION CONTRARY TO LAW**

127.    Premier incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

30

128.    The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or is "otherwise not in accordance with law." 5 U.S.C. § 706(2)(C).

129.    HRSA's actions are invalid under the APA. HRSA's 2013 Policy interpreting the GPO limitation to prohibit covered entity hospitals from purchasing their initial neutral inventories through a GPO account has no basis in the statutory text. It is therefore invalid. *Texas*, 726 F.3d at 195 ("[A] regulation can never trump the plain meaning of a statute"); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'").

130.    Thus, HRSA's action is unlawful as applied to Premier and its members and must be set aside. 5 U.S.C. § 706(2)(C).

## COUNT II
## ARBITRARY AND CAPRICIOUS AGENCY ACTION

131.    Premier incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

132.    The APA compels courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133.    HRSA's actions violate the APA's requirement that agency decisionmaking not be arbitrary, capricious, or an abuse of discretion.

134.    HRSA's policy is "arbitrary or capricious in substance," (*Amaya*, 986 F.3d at 432), as it frustrates Congress's goals of the 340B Program (*Illinois Commerce Comm'n*, 749 F.2d at 880). The 2013 Policy is also not a product of "reasoned decisionmaking" and reflects a sub-silentio departure from longstanding policy. *Fox v. Clinton*, 684 F.3d at 69; *FCC v. Fox*, 556 U.S. at 515.

135.    Accordingly, HRSA's action was arbitrary and capricious and must be set aside. 5 U.S.C. § 706(2)(A).

136.    At the very least, HRSA's 2013 Policy must be determined arbitrary and capricious as it applies to Premier and its members.

**COUNT III**
**AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY**

137.    Premier incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

138.    The APA instructs courts to "hold unlawful and set aside" agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

139.    HRSA's power to enact legislative rules "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

140.    HRSA's adoption of a substantive rule in the 2013 Policy exceeds its statutory authority, as HRSA lacks the authority to issue legislative rules except in limited areas specified by Congress not applicable here. *Pharm. Rsch. & Mfrs. of Am. v. U.S. DHHS*, 45 F. Supp. 3d 28, 41 (D.D.C. 2014).

141.    Thus, HRSA's action exceeds its statutory authority and is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 705(2)(C).

142.    Premier has standing to challenge HRSA's policy on this ground. "[A] party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule." *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999); *see NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987) ("[A] party who possesses standing may challenge regulations directly on the ground that the issuing agency acted in excess of its statutory authority in promulgating them.").

143.     Because HRSA's 2013 policy was issued in excess of HRSA's statutory authority, it must be determined unlawful as it applies to Premier and its members.

**COUNT IV**
**DECLARATORY JUDGMENT ACT**

144.     Premier incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

145.     The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

146.     As described above, there is an actual controversy between Premier and HRSA that is within this Court's jurisdiction.

147.     Premier therefore requests, in addition to APA relief, that the Court issue a declaratory judgment declaring that HRSA's 2013 Policy is contrary to law and was issued in excess of HRSA's limited grant of rulemaking authority. Premier further requests that the Court issue a declaratory judgment declaring that HRSA's 2013 Policy is arbitrary and capricious, and at the very least, is arbitrary and capricious as applied to Premier and its members.

**PRAYER FOR RELIEF**

WHEREFORE, Premier respectfully requests that the Court enter judgment in its favor and that the Court:

1.  Set aside and vacate HRSA's decision denying Premier's request for an exemption from the 2013 Policy;

2.  Enjoin HRSA from applying the 2013 Policy to Premier or any of Premier's covered entity hospital members;

3.  Declare that the purchasing of initial neutral inventory in a virtual replenishment system through a GPO or other group purchasing arrangement is lawful;

4.  Declare that HRSA's 2013 Policy is unlawful when applied to Premier and its members;

5.  Set aside and vacate HRSA's 2013 Policy;

6.  Award Premier attorney's fees and costs; and

7.  Award Premier such other and further relief as the Court may deem just and proper.


Dated: November 1, 2024                    Respectfully submitted,

                                           /s/ *Paul W. Hughes*
                                           Paul W. Hughes (Bar No. 997235)
                                           Andrew A. Lyons-Berg (Bar No. 230182)
                                           Grace Wallack (Bar No. D00593)
                                           MCDERMOTT WILL & EMERY LLP
                                           500 North Capitol Street NW
                                           Washington, DC 20001
                                           (202) 756-8000
                                           phughes@mwe.com

                                           Emily J. Cook*
                                           MCDERMOTT WILL & EMERY LLP
                                           2049 Century Park E #3200
                                           Los Angeles, CA 90067
                                           (310) 277-4110
                                           ecook@mwe.com

                                           *Attorneys for Plaintiff Premier, Inc.*

                                           *\*pro hac vice forthcoming*