# EXHIBIT 3



July 27, 2023

LCDR Emeka Egwim, PharmD, RPh
United States Public Health Service Director
Office of Pharmacy Affairs
Health Resources and Services Administration
5600 Fishers Lane
Mail Stop 08W05A
Rockville, MD 20857

*Sent via USPS certified mail and also submitted via email to CEgwim@hrsa.gov*

**Re: Request to Revise Policy Release 2013-1**

Dear LCDR Egwim:

Premier Inc. submits this letter to respectfully inform the Health Resources and Services Administration (HRSA) that it intends to promote and to offer to its 340B hospital covered entity clients the ability to make initial purchases of drugs through their Premier Group Purchasing Organization (GPO) accounts. Premier's provision of this purchasing model for hospitals subject to the 340B GPO limitation will preserve needed resources for these hospitals, including achieving the government-mandated prudent buyer principles that they must adopt as a component of their participation in the Medicare program.

Once Premier makes its hospital clients aware of this letter and, assuming a favorable response from HRSA, Premier is aware that at least some of its 340B hospital clients subject to the GPO limitation - and it anticipates many, if not most, of such clients - will immediately request to participate in this arrangement, whereby drugs that were previously purchased at higher costs through non-340B/non-GPO accounts due to concerns about violating the GPO limitation, will be available for purchase through Premier GPO accounts at Premier's lower, negotiated prices. In view of the urgency that these 340B hospitals face with respect to drug pricing, Premier respectfully requests a response by HRSA within 45 calendar days from the date of this letter, which is September 11, 2023, confirming that it agrees the intended arrangement is lawful. If HRSA declines to respond, Premier will reasonably anticipate that HRSA has accepted the arguments contained in this letter and, further, that HRSA agrees that this is a lawful arrangement. If HRSA disagrees with Premier's position, Premier requests HRSA provide a prompt response to that effect by September 11, 2023.

Premier recognizes that its request will require HRSA to either exempt Premier and its hospital clients from Policy Release 2013-1 (the "Policy")[1] or otherwise review and reverse that analysis. That Policy, through a construction of 42 U.S.C. § 256b(a)(4)(L)(iii) (the "GPO limitation"), purports to impose a limitation on group purchasing at the time a covered hospital purchases its initial inventory. Premier respectfully submits that this conclusion is wrong, and thus - barring a response from HRSA - it intends to engage in the relationship outlined in this letter.

1. **Introduction**

Premier is a leading alliance of hospitals, health systems, and other providers, all of whom share the goal of improving and innovating in the clinical, financial, and operational areas of their businesses. Premier

---

[1] See attached Policy Release No. 2013-1, Statutory Prohibition on Group Purchasing Organization Participation (Feb. 7, 2013).

DocuSign Envelope ID: F8EDBE97-968A-4B57-BF19-F8FDB2B606EC
Case 1:24-cv-03116-LLA   Document 1-4   Filed 11/01/24   Page 3 of 11

Request to Revise Policy Release 2013-1
July 27, 2023
Page 2 of 7

serves its clients by improving efficiency and effectiveness of the healthcare supply chain through a number of client services, including a GPO program. Both Premier and its clients are directly affected by the Policy because it purports to prohibit Premier from offering its 340B hospital clients lower negotiated rates for drugs to stock their initial inventories.

The Policy asserts HRSA's position that the statutory GPO limitation prohibits hospitals participating in the 340B Program from using drug replenishment systems in which initial neutral inventories are purchased from a GPO account. The Policy requires that such hospitals instead purchase their initial neutral inventories on a non-340B, non-GPO account, commonly referred to as a wholesale acquisition cost (WAC) account. That policy is at odds with the plain language of the governing statute, 42 U.S.C. § 256b (the "340B Statute"). Moreover, it is inconsistent with the 340B Statute's legislative intent, which is to provide covered entities access to lower drug prices so that they can stretch scarce federal resources as far as possible. The Policy, however, improperly transfers resources from covered entities *to drug manufacturers* by compelling covered entities to purchase drugs at a higher cost through a WAC account when a lower price may be available through the hospital's GPO.[2]

Moreover, requiring hospitals to use WAC-based replenishment systems, in which a hospital's initial inventory is purchased on the prime vendor's WAC account, suppresses competition and increases drug costs because it steers hospital purchasing of both 340B outpatient drugs and non-340B inpatient drugs to HRSA's sole prime vendor contractor. Further, requiring hospitals to use WAC accounts to purchase drugs that the 340B Statute allows to be purchased through a GPO is inconsistent with the Medicare "prudent buyer" principle,[3] which instructs hospitals to obtain Medicare-reimbursed drugs at the lowest available cost. A GPO-purchased initial inventory model is supported by U.S. Supreme Court precedent; there, the Court recommended a virtual replenishment inventory model, where initial inventory is purchased at discounted rates and then adjusted as necessary at a later date. Finally, HRSA has publicly acknowledged that 340B drug purchasing occurs upon replenishment in the virtual inventory model - not upon the initial purchase of neutral inventory. It follows that the neutral inventory purchase cannot be subject to the GPO limitation because drugs in the neutral inventory are not covered outpatient drugs.

For these reasons, we respectfully request that HRSA confirm that Premier's intended arrangement is lawful. That may require HRSA to either exempt Premier and its clients from the Policy, or to otherwise revise the Policy to return to the GPO-based replenishment systems that prevailed for more than twenty years prior to HRSA's issuance of the Policy.[4]

2. **Background: The GPO Limitation and the Policy**

Generally, the 340B Statute provides that certain drug manufacturers must offer "covered entities" reduced prices to purchase "covered outpatient drugs."[5] For certain hospitals to qualify as a "covered entity," the hospital may not obtain "covered outpatient drugs" through a GPO or other group purchasing arrangement.[6] The 340B Statute does not, however, prohibit hospitals from purchasing other types of drugs through a GPO or other group purchasing arrangement. The limitation applies only to purchasing covered outpatient drugs. In other words, the GPO limitation (and the entirety of the 340B Statute, for that matter) does not apply to drugs that are dispensed to inpatients or that are otherwise carved out of the definition of a "covered

---

[2] Hospital executives have indicated that GPOs reduce the cost of healthcare supplies by 10% to 18%. *See* O'Brien *et al.*, *Group Purchasing Organizations: How GPOs Reduce Healthcare Costs and Why Changing Their Funding Mechanism Would Raise Costs: A Legal and Economic Analysis*, available at https://supplychainassociation.org/wp-content/uploads/2018/05/Leibowitz_GPO_Report.pdf (last visited Apr. 6, 2023).
[3] CMS, Provider Reimbursement Manual – Part 1, CH. 21, Sec. 2103.
[4] When initially implementing the 340B program, HRSA interpreted the limitation as only preventing covered entities from receiving 340B discounts on the same drugs purchased through a GPO. *See Univ. Med. Ctr. of So. Nev. v. Shalala*, 173 F.3d 438, 439 (D.C. Cir. 1999).
[5] 42 U.S.C. § 256b(a).
[6] 42 U.S.C. § 256b(a)(4)(L)(iii).

DocuSign Envelope ID: F8EDBE97-988A-4B57-BF19-F8FDB2B606EC
Case 1:24-cv-03116-LLA      Document 1-4      Filed 11/01/24      Page 4 of 11

Request to Revise Policy Release 2013-1
July 27, 2023
Page 3 of 7

outpatient drug."[7] In this way, the GPO limitation provides 340B hospitals a choice of receiving outpatient drug discounts through their GPO or through the 340B Program - but not both. That is, hospitals may not receive GPO and 340B discounts on the same drug nor may they "cherry-pick" GPO pricing for some outpatient drugs and 340B pricing for others.[8]

The Policy addresses the GPO limitation in the context of a virtual replenishment inventory system. A virtual replenishment inventory system is commonly used by hospital covered entities that maintain a single drug inventory to dispense drugs to inpatients and outpatients. Drugs purchased for these inventories are known as "neutral inventory" because the hospital has purchased the drugs on an account that corresponds to the eligibility of a prior dispense of the drug. For example, if a 340B-eligible outpatient receives a drug from the neutral inventory, it will be "accumulated" for a future purchase on the hospital's 340B account to replace the dispensed drug and if an inpatient receives a drug from the neutral inventory, it will be accumulated for a future purchase on the hospital's GPO account to replace the dispensed drug. After sufficient quantities of a particular drug are dispensed and accumulated to a particular account to allow for ordering a full package size of the drug, the hospital will purchase the accumulated replacement drugs to replenish the pharmacy inventory.

HRSA's Policy addressed covered entities' use of the "replenishment model," concluding that a 340B covered entity subject to the GPO limitation should purchase initial drug stock for the pharmacy inventory using a WAC account and only replenish the inventory with 340B drugs once 340B patient eligibility is confirmed (that is, once a drug is dispensed to an outpatient). HRSA opined that a hospital would violate the GPO limitation if it were to use a GPO to obtain the initial drug stock. In its analysis, however, HRSA did not address how a drug in an initial inventory could be considered a "covered outpatient drug" at the time of purchase, when the drug purchased may actually be dispensed to an inpatient. In fact, the Policy rejected the possibility of recategorizing drugs subsequent to the initial purchase. In this way, that Policy is inconsistent with how a virtual replenishment inventory model works, confirming that it is at odds with the 340B Statute.

HRSA's position has dramatically increased drug purchasing costs to covered entity hospitals by prohibiting them from purchasing initial neutral inventory through a GPO, resulting in higher revenue for drug manufacturers and the 340B prime vendor, and less savings for covered entities. Purchasing initial drug stock for a pharmacy inventory through a GPO as opposed to WAC pricing can result in significant savings to covered entity hospitals due to the price reductions that GPOs may negotiate.[9]

3. **The Policy is Inconsistent With the 340B Statute**

The text of the 340B Statute and the definition of "covered outpatient drug" in the Medicaid rebate statute (as incorporated into the 340B Statute) yield a straightforward result. The GPO limitation applies to <u>replenishment</u> orders in a virtual replenishment inventory. That limitation does not, however, apply to <u>initial</u> drug purchases for a pharmacy operated using a virtual replenishment inventory. Specifically, when a drug is dispensed to a patient from a virtual replenishment inventory, there are two drug purchases directly tied to the dispense. The first purchase is for the initial inventory, that is, the purchase for the drug that was

---

[7]  340B FAQ, https://www.340bpvp.com/hrsa-faqs (last visited Dec. 15, 2022).
[8]  *See Univ. Med. Ctr. of S. Nev. v. Shalala*, 5 F. Supp. 2d 4, 8 (D.D.C. 1998); *see also* OPA, FAQ 422 (last visited Mar. 7, 2005) (stating that hospitals may purchase outpatient drugs through a GPO for a period of time after the hospital first enrolls in the 340B program, but they may not "cherry pick" which drugs to buy through 340B and which ones not to buy). This FAQ has been rescinded. We cite the rescinded FAQ as evidence of HRSA's prior interpretation of the GPO limitation.
[9]  As noted above, hospital executives have indicated that GPOs reduce the cost of healthcare supplies by 10% to 18%. *See* O'Brien *et al.*, *Group Purchasing Organizations: How GPOs Reduce Healthcare Costs and Why Changing Their Funding Mechanism Would Raise Costs: A Legal and Economic Analysis*, available at https://supplychainassociation.org/wp-content/uploads/2018/05/Leibowitz_GPO_Report.pdf (last visited Apr. 6, 2023).

DocuSign Envelope ID: F8EDBE97-988A-4B57-BF19-F8FDB2B606EC
Case 1:24-cv-03116-LLA    Document 1-4    Filed 11/01/24    Page 5 of 11

Request to Revise Policy Release 2013-1
July 27, 2023
Page 4 of 7

dispensed to the patient. The second purchase is for the replenishment drug that is "accumulated" and then ordered after the initial drug is dispensed. The GPO limitation applies to this second purchase, not the first purchase. This is for a clear, simple reason: The GPO limitation cannot be implicated until a drug becomes a covered outpatient drug, and this does not occur until a drug is in fact dispensed to an outpatient.

Prior to the actual dispensing, the drug cannot be categorized as a covered outpatient drug because the recipient of the drug is undetermined. Specifically, the Medicaid definition of "covered outpatient drug" is dependent upon the specific circumstances in which a drug is "provided" to a patient.[10] As a result, a drug cannot be a "covered outpatient drug" until the circumstances in which the drug is or will be provided to a patient is known. When a covered entity obtains a drug to stock an initial neutral inventory, it is unknown whether the drug will be provided to a patient in circumstances that would qualify the drug as a covered outpatient drug. Therefore, such drugs cannot be "covered outpatient drugs" at the time they are initially obtained.

Because a drug cannot qualify as a "covered outpatient drug" at the time it is initially obtained, the GPO limitation cannot apply to the initial stocking of a drug in such a model. That is, the GPO limitation provides that a hospital will not be considered a covered entity for purposes of the payment amount restriction if the hospital "obtain[s] covered outpatient drugs through a GPO or other group purchasing arrangement." When the drug is provided to a patient in such circumstances that the drug becomes a covered outpatient drug, the future replenishment of that drug with a GPO-purchased drug is reflected in the GPO accumulator for that drug in the hospital's virtual replenishment inventory. This "replenishment" purchase of the dispensed drug through the hospital's GPO purchasing account is the purchase of the drug that is subject to the GPO limitation.

This understanding of the GPO limitation is consistent with the use of the virtual replenishment inventory for compliance with the prohibition on 340B drug diversion. Specifically, the statutory prohibition on 340B drug diversion prohibits covered entities from "resell[ing] or otherwise transfer[ing] the [340B-purchased] drug to a person who is not a patient of the entity."[11] The resale provision makes clear that a 340B-purchased drug is so classified at the time of purchase, because the provision regulates only covered entities' handling of drugs already purchased at the 340B price. Unlike the GPO limitation, the resale provision does not regulate the purchase of the drug - it regulates what a covered entity may do with a drug it has already purchased on a 340B account. In other words, a drug is deemed to be a 340B-purchased drug for purposes of the resale prohibition at the time of purchase because it was purchased on a 340B account, even if the drug had not yet been dispensed to a patient. Therefore, while the GPO limitation applies to the second "replenishment" purchase in a virtual replenishment inventory model (because the second purchase is the only purchase that can be made through a 340B account, where it is unknown if a drug qualifies for 340B purchase until it is dispensed), the resale provision applies to drugs purchased on a 340B account upon the first initial purchase (because the initial purchase must have been at the 340B price for the resale prohibition to apply). As such, in order to operate a virtual replenishment inventory model, the hospital must always purchase 340B drugs based on a prior eligible instance of dispensing to a 340B-eligible patient. Otherwise, the drug retains its 340B-purchased status and could only be provided to a 340B-eligible patient (for example, it could not be provided to an inpatient).

To be clear, hospitals that use a GPO-based replenishment system do not "cherry-pick" pricing or purchase covered outpatient drugs through a GPO. By applying the GPO limitation at the replenishment stage of inventory management, these hospitals are in compliance with the statutory requirement that they "do not obtain" covered outpatient drugs through a GPO because their software systems reconcile purchases and dispenses to ensure that the quantity of drugs obtained at 340B discounts matches the quantity of drugs dispensed to 340B-eligible patients.

---

[10]  42 U.S.C. § 1396r-8(k)(3).
[11]  42 U.S.C. § 256b(a)(5)(B).

DocuSign Envelope ID: F8EDBE97-988A-4B57-BF19-F8FDB2B606EC
Case 1:24-cv-03116-LLA    Document 1-4    Filed 11/01/24    Page 6 of 11

Request to Revise Policy Release 2013-1
July 27, 2023
Page 5 of 7

4. **Revising the Policy Would Correct Market Distortions**

Returning to a pre-2013 GPO-based purchasing environment would address other unintended distortions in the hospital drug market. It would restore competition on outpatient and inpatient drug purchasing where the 340B prime vendor's WAC portfolio has displaced GPO pricing. This is despite the fact that inpatient GPO contracts and pricing falls outside the scope of the 340B program. Hospitals tend to buy the same drugs for their inpatients and outpatients, so forcing them to buy their initial neutral inventory through a WAC account dominated by 340B prime vendor pricing locks hospitals into using the 340B prime vendor's preferred drugs and preferred prices within the inpatient market. This is a clear departure from what Congress intended.

5. **The Policy is Inconsistent with the Prudent Buyer Principle**

For over 50 years, the federal government has maintained a "prudent buyer" principle for healthcare providers, pursuant to which the government expects providers to be "prudent and cost-conscious purchasers" of services.[12] The principle is currently set forth in the current Medicare Provider Reimbursement Manual:

> The prudent and cost-conscious buyer not only refuses to pay more than the going price for an item or service, he/she also seeks to economize by minimizing cost. **This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases.** In addition, bulk purchase of items or services often gives the buyer leverage in bargaining with suppliers for other items or services.[13]

HRSA's position in the Policy regarding GPO purchasing for initial neutral inventory is directly opposed to this principle. The Policy actually *prohibits* 340B hospitals from acting as a "prudent and cost-conscious purchaser" of drugs and requires them to purchase drugs at a higher price than the hospitals could otherwise obtain. The result is higher expenditures for hospitals on initial neutral inventory, and greater revenue for drug manufacturers and the 340B prime vendor and, importantly, higher costs to federal and state healthcare programs. Because the Policy conflicts with the long-established prudent buyer principle, we request HRSA promptly reverse course and permit 340B hospitals to purchase initial neutral inventory on GPO accounts.

6. **Supreme Court Precedent Supports a GPO Neutral Inventory System**

The GPO replenishment system is also supported by the Supreme Court's reasoning in *Abbott Laboratories v. Portland Retail Druggists*, where the Court analyzed a federal pricing law similar to the 340B GPO limitation.[14] In *Abbott*, the Court analyzed whether GPO purchases by hospitals are consistent with a federal antitrust law prohibiting preferential pricing among customers that share a common profile (like the volume of purchases they make). Such laws are analogous to the 340B GPO limitation because both forbid non-profit hospitals from using GPO-negotiated pricing for some, but not all, of their drugs.

In *Abbott*, the Court concluded that the antitrust law applied to some drugs but not others, depending on the circumstances in which a drug was dispensed by the hospital. Whereas the hospital was able to avail

---

[12] *See, e.g.*, U.S. Bureau of Health Insurance, Intermediary Letter No. 393, *Identifying unreasonable costs—application of the prudent buyer concept*, (Aug. 1969).
[13] CMS, Provider Reimbursement Manual – Part 1, CH. 21, Sec. 2103.
[14] *Abbott Labs. v. Portland Retail Druggists*, 425 U.S. 1 (1976). The Robinson-Patman antidiscrimination provision of the antitrust laws effectively prohibits hospitals from purchasing drugs at preferential prices from manufacturers. Despite this prohibition, the Court held that the Nonprofit Institutions Act permits such sales if the hospitals are non-profit and meet other conditions. *Id*. at 20-21.

itself of an exception to the antitrust law for drugs purchased for the hospital's "own use" (and therefore the hospital could purchase the drug through a GPO), drugs that the hospital purchased not for its "own use" were subject to the antitrust law (and therefore the hospital could not purchase the drug through a GPO). The Court concluded that when the hospital dispensed drugs in certain scenarios, the drugs were for the hospital's own use and exempt from the antitrust law (e.g., drugs dispensed to inpatients), whereas when the hospital dispensed drugs in other scenarios, the drugs were not for the hospital's own use and not exempt from the antitrust law (e.g., drug dispenses to a walk-in customer who is not a patient of the hospital).

The Court considered whether it would be "objectionable and unworkable" to create an exempt vs. non-exempt standard applicable to *purchasing* a drug based on the eventual *dispense* of the drug, concluding that hospitals could reasonably create a "recordkeeping procedure" that categorized drugs by nonexempt use and exempt use. The hospital would then submit an accounting and price adjustment to the drug manufacturer after the drug was dispensed. This "recordkeeping procedure" is another term for a "virtual inventory" in modern parlance.

Consistent with *Abbott,* a GPO-based replenishment model is permissible and in fact necessary to facilitate a purchasing standard based on eventual dispense of a drug. A 340B hospital operates consistent with general accounting principles and is legally compliant with the 340B Statute if it makes initial purchases through a GPO account and then replenishes each drug with a 340B-purchased drug for 340B-eligible patients or with a drug purchased through a GPO or other non-340B account for all other patients.

### 7. HRSA's Own Position

In a signed Declaration dated June 16, 2021, the Director of the Office of Pharmacy Affairs, Rear Admiral Krista M. Pedley, explained - on behalf of HRSA - that the virtual replenishment model is compliant with the 340B Statute.[15] Although these statements were made in the context of virtual replenishment models used in the contract pharmacy setting, which are not identical to the virtual replenishment models used in hospital pharmacies and do not involve the purchase of any drugs by hospitals through GPO accounts, the general underlying concepts for compliance with the 340B Statute in a virtual replenishment model are analogous between the two types of models. RADM Pedley noted that covered entities must maintain systems to demonstrate that the covered entity is properly accounting for 340B drug purchases in the replenishment orders, which HRSA can then audit to confirm compliance. RADM Pedley expressly recognized that the replenished "neutral inventory" "may be dispensed to any subsequent patient."

RADM Pedley's Declaration makes clear that it is HRSA's position that 340B drug purchases occur when neutral inventory is replenished, and that the initial purchase of neutral inventory is not a 340B drug purchase. It follows that the GPO limitation cannot apply to the initial purchase of neutral inventory under HRSA's own reasoning, because drugs purchased through a GPO for a neutral inventory are not "covered outpatient drugs" at the time of purchase.

\*     \*     \*

In light of the above, we respectfully ask HRSA to confirm that Premier's proposed arrangement is lawful. Assuming such a confirmation, or in the absence of a definitive response from HRSA, Premier intends to make its hospital clients aware of this letter and HRSA's response or absence of a definitive response. Premier is aware that many of its 340B hospital customers would begin to purchase initial drug inventories

---

[15] The declaration was submitted in *Eli Lilly & Co. v. Becerra*, Case No. 1:21-cv-00081-SEB-MJD, ECF No. 125-2 (June 25, 2021); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, Case No. 3:21-cv-00634-FLW-LHG, ECF No, 89-2 (June 16, 2021); *Novo Nordisk Inc. v. U.S. Dep't of Health & Hum. Servs.*, Case No. 3:21-cv-00806-FLW-LHG, ECF No. 53-2 (June 22, 2021); and *United Therapeutics Corp. v. Espinosa*, Case No. 1:21-cv-01686-DLF, ECF No. 17-1 (August 10, 2021).

DocuSign Envelope ID: F8EDBE97-968A-4B57-BF19-F8FDB2B606EC
Case 1:24-cv-03116-LLA   Document 1-4   Filed 11/01/24   Page 8 of 11

Request to Revise Policy Release 2013-1
July 27, 2023
Page 7 of 7

from a GPO account, consider such GPO purchases as neutral inventory, dispense such initial neutral inventory to 340B-eligible patients, and then replenish the drugs with purchases from a 340B account.

We request that HRSA confirm, by September 11, 2023, that it agrees that this model is consistent with the 340B Statute. This will require HRSA confirming that initial inventory, purchased at GPO prices, is considered neutral inventory, and can be dispensed to 340B eligible patients, or otherwise reversing and revising the Policy. If HRSA declines to respond by September 11, 2023, Premier will reasonably anticipate that HRSA has accepted the arguments contained in this letter and, further, that HRSA agrees that this is a lawful arrangement.

If you have any questions regarding this request, please contact me at 704-816-6322 or email me at David_Klatsky@premierinc.com. Any responsive materials that cannot be emailed may be sent to me at the address below:

- Attn: David Klatsky, General Counsel
  13034 Ballantyne Corporate Place
  Charlotte, NC 28277

We appreciate your assistance on this important matter and look forward to your reply.

Sincerely,

*DocuSigned by:*
*David Klatsky*
65FAA9E0CF74496...

David Klatsky
General Counsel
Premier Inc.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Health Resources and Services Administration
Healthcare System Bureau
Office of Pharmacy Affairs
Date: February 7, 2013



**340B DRUG PRICING PROGRAM NOTICE**
Release No. 2013-1

## STATUTORY PROHIBITION ON
## GROUP PURCHASING ORGANIZATION PARTICIPATION

This policy release is being issued to clarify the 340B Drug Pricing Program's (340B Program) policy regarding the statutory prohibition against obtaining covered outpatient drugs through a group purchasing organization (GPO) for certain covered entities.

**Background**
Section 602 of Public Law 102-585, the "Veterans Health Care Act of 1992," enacted section 340B of the Public Health Service Act (PHSA), "Limitation on Prices of Drugs Purchased by Covered Entities."  The Health Resources and Services Administration's (HRSA) Office of Pharmacy Affairs (OPA) administers the 340B Program.

Disproportionate share hospitals (DSH), children's hospitals, and free-standing cancer hospitals participating in the 340B Program under 42 U.S.C. 256b(a)(4)(L) and (M) are subject to 42 U.S.C. 256b(a)(4)(L)(iii), which states that in order to participate in the 340B Program, these entities may not "obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement."

Since the beginning of the 340B Program, HRSA has addressed violations of this prohibition in guidelines published in the Federal Register, stating that if a covered entity subject to this prohibition participates in a GPO, the covered entity "will no longer be an eligible covered entity and cannot purchase covered outpatient drugs at the section 340B discount prices." 59 FR 25113 (May 13, 1994).  Final children's hospital guidelines state that "a children's hospital will have to certify that it will not participate in a group purchasing organization (GPO) or other group purchasing arrangement for covered outpatient drugs as of the effective date of participation as listed in the 340B covered entity database." 74 FR 45210 (September 1, 2009).  This document serves to further explain and clarify HRSA's position on questions that have arisen as the marketplace has changed.

**Scope of GPO Prohibition and Certification of Compliance**
Compliance with the GPO prohibition is an eligibility requirement for certain categories of eligible entities.  Upon registration for the 340B Program, an authorizing official of a DSH, children's hospital, or free-standing cancer hospital must sign an acknowledgement of this statutory requirement.  The covered entity must also attest to compliance with the GPO prohibition during the 340B annual recertification process.  This requirement is reviewed during HRSA 340B Program audits.  It is HRSA's longstanding position that a covered entity enrolled

in the 340B Program subject to the GPO prohibition and listed on the OPA 340B database may not use a GPO for covered outpatient drugs at any point in time. If a covered entity is unable to purchase a covered outpatient drug at the 340B price, written notification should be sent to OPA immediately detailing the covered outpatient drug(s) involved, the manufacturer, and the process by which the entity was notified that the purchase could not be made. HRSA reviews all allegations brought to our attention to ensure compliance with program requirements.

**Outpatient Clinic Sites and Areas of the Hospital where GPO Prohibition Applies**
Hospitals and their off-site outpatient clinic sites that are registered on the OPA 340B database as participating in the 340B Program are subject to the GPO prohibition and cannot purchase any covered outpatient drugs through a GPO or other group purchasing arrangement. A hospital subject to the GPO prohibition may not purchase covered outpatient drugs through a GPO for any of its clinics/departments within the four walls of the hospital (same physical address) under any circumstance. However, certain off-site outpatient facilities of the hospital may use a GPO for covered outpatient drugs if those off-site outpatient facilities meet all of the following criteria:

1. Are located at a different physical address than the parent;
2. Are not registered on the OPA 340B database as participating in the 340B Program;
3. Purchase drugs through a separate pharmacy wholesaler account than the 340B participating parent; and
4. The hospital maintains records demonstrating that any covered outpatient drugs purchased through the GPO at these sites are not utilized or otherwise transferred to the parent hospital or any outpatient facilities registered on the OPA 340B database.

Organizations that are not part of the 340B covered entity are not subject to the GPO prohibition; however, the 340B covered entity is still prohibited from having organizations purchase covered outpatient drugs through a GPO on its behalf or otherwise receive covered outpatient drugs purchased through a GPO. A 340B covered entity purchases and maintains title to the drugs, not a contract pharmacy (see 75 Fed. Reg. 10272, 10277 (March 5, 2010)). Therefore, a hospital subject to the GPO prohibition cannot use a GPO for covered outpatient drugs, even if the drugs are dispensed at a contract pharmacy.

**Date of GPO Prohibition Compliance**
340B covered entities subject to the GPO prohibition must stop obtaining covered outpatient drugs through a GPO before the first day the covered entity is eligible to purchase 340B drugs and listed on the OPA 340B database. If a covered entity has GPO-purchased drugs remaining in inventory once enrolled in the 340B Program, those drugs may be used until expended; however, purchasing from a GPO should cease.

**Compliance through "Replenishment"**
Through HRSA's 340B Program integrity initiatives, HRSA has become aware that some hospitals subject to the GPO prohibition have been purchasing covered outpatient drugs through a GPO and subsequently either (1) "replenishing" through accounting by "replacing" the GPO purchased drug with a drug purchased under 340B; or (2) otherwise reclassifying the method of purchase after dispensing. HRSA has not authorized this GPO replenishment model. The GPO

2

prohibition is violated upon use of a GPO to obtain covered outpatient drugs and cannot be fixed or cured by subsequently changing the characterization through accounting or other methods. Hospitals using such models should immediately cease this practice or be found in violation of the GPO prohibition. If a covered entity violates the GPO prohibition, it will be removed from the 340B Program as it will no longer be eligible for participation.

A 340B covered entity subject to the GPO prohibition should purchase using a non-GPO account and only replenish with 340B drugs once 340B patient eligibility is confirmed and can be documented through auditable records. Covered entities electing to use this or any other replenishment model must be able to demonstrate compliance with the GPO prohibition through auditable records.

**Sanctions**
Since the GPO prohibition is an eligibility requirement, covered entities found in violation will be considered ineligible and immediately removed from the 340B Program. Covered entities may also be subject to repayment to manufacturers for the time period for which the violation occurred. Covered entities removed from the 340B Program for GPO prohibition violations must demonstrate the ability to comply with the GPO prohibition to be considered eligible to reenter the 340B Program during the next regular enrollment period.

If a GPO prohibition violation occurs at a parent site, all outpatient clinics, contract pharmacies, or sites enrolled that are related to the covered entity 340B ID will be removed from the 340B Program with the parent. The covered entity "parent" is responsible for ensuring compliance with all outpatient clinics, contract pharmacies, and sites that participate in the 340B Program.